

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,079

### ISIDRO MIGUEL DELACRUZ, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. B-14-1134-SA
### IN THE 119TH DISTRICT COURT
### TOM GREEN COUNTY

**MCCLURE, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

In April 2018, a jury convicted Appellant of capital murder for intentionally or knowingly causing the death of an individual under ten years of age. TEX. PENAL CODE § 19.03(a)(8). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

Direct appeal to this Court is automatic. *Id.* § 2(h). Appellant raises twelve points of error. We affirm the trial court's judgment of conviction and sentence of death.

## I.     BACKGROUND

Appellant and Tanya Bermea had an "on again, off again" relationship that was described at trial as turbulent and dysfunctional. On the night of September 1, 2014, Tanya put her five-year-old daughter, N.V., to bed. Tanya later received several phone calls from a number she did not recognize, but she suspected the calls were from Appellant. The two had argued a few hours earlier when Appellant did not give Tanya money that he had promised her. In the early morning hours of September 2, Tanya heard a noise in the back of the house, just outside of the bathroom window, which was partially broken and patched with duct tape. Tanya saw Appellant entering through the bathroom window. She ran out the front door, leaving N.V. asleep in her bed.

Surveillance cameras mounted outside of a business across the street from Tanya's house captured Tanya after she left the house and headed down the street. The security video was admitted into evidence and played for the jury during Tanya's testimony. The video shows Tanya passing by on the street and, about a minute and a half later, Appellant following. Then, about four and a half minutes after that, the video shows Appellant running back towards Tanya's house.

Tanya testified that after she fled the house, she called her mother, Jesusita Bermea, and asked her to pick her up. Jesusita picked Tanya up within minutes and they returned to the house. Tanya testified that when they got back to the house, the front door was locked, but Appellant came out, knocked Jesusita to the ground, and punched Tanya. Jesusita ran down the street and called the police. Dispatch received Jesusita's call at 2:30 a.m.

In the meantime, Tanya drove to Appellant's parents' house down the street to try to persuade them to get Appellant out of Tanya's house. Tanya returned to her house six to eight minutes later, unsuccessful in recruiting their assistance. Tanya testified that the front door was open when she got back, and she saw N.V. on the living room floor with bloody paper towels on her neck. Appellant shoved Tanya out the door and slammed her to the ground.

A neighbor testified to being awakened around 2:35 a.m. by a woman she later recognized as Tanya banging on the front door of Tanya's house and yelling to be let in. She then saw Tanya wrestling with a man in the front yard. The neighbor called 911.

Officer Marcus Rodriguez was the first officer to arrive at 2:37 a.m. The security video captures his arrival about fifteen minutes after Tanya initially fled the house and almost ten minutes after Appellant ran back to the house. Rodriguez found N.V. lying on the floor with blood around her neck. Rodriguez asked Appellant what

happened, and Appellant responded that "she slit her throat" and he "didn't do anything." Other officers arrived and began attending to N.V., who was alive but "barely breathing." When Appellant became angry and violent with the officers attending to N.V., he was handcuffed and placed in a patrol car. An ambulance and paramedics arrived at 2:45 a.m. N.V. was transported to the hospital where doctors pronounced her dead shortly after her arrival.

Officers found Appellant's blood throughout Tanya's house, including around the bathroom window and sill, in the bathtub and sink, on walls, blinds, light switches, doorknobs and doors, closet doors, counters, furniture, and floors.[1] The bloody trail went into N.V.'s bedroom where her bedding was saturated with her own blood. The wall by N.V.'s bed showed two "path[s]" of blood, one originating from N.V. and the other from Appellant. Appellant was wet and bloody, as was the kitchen sink. The blood in and around the kitchen sink was a mixture of Appellant's and N.V.'s blood. Officers followed a trail of blood from Tanya's driveway across

---

[1] There was a three to five inch laceration on the back of Appellant's left arm. In his statement to police, Appellant suggested that Tanya cut his arm with a knife. The paramedic who treated the injury at the scene testified that the cut was smooth, not jagged, and was consistent with having been caused by glass or by a knife. Detective Carlton Kolbe testified that when he was working on the case, he made an inquiry to "the medical examiner" as to the likely cause of the cut to Appellant's arm, and received an email reply that the wound was more consistent with being caused by a knife than by glass. It is not clear whether this was the same medical examiner who conducted N.V.'s autopsy. However, the medical examiner who conducted N.V.'s autopsy testified that the injury to Appellant's arm could have been caused by a knife, a piece of glass, or "anything sharp." Appellant's blood was found on the side of the house outside of the bathroom window where he entered and on the floor below the window.

the street to a field where they found a bloody knife. N.V.'s and Appellant's DNA were recovered from blood on the knife.

The medical evidence showed that N.V. died from two knife wounds to her neck. One of the cuts penetrated (and almost severed) her jugular vein. The other cut nearly reached the floor of her mouth. Bruising and a cut to N.V.'s chin suggested that her head was positioned and held still as her throat was sliced. The medical examiner testified that without medical intervention, N.V. would have died from her injuries within three to seven minutes. With the application of immediate and consistent pressure to the injuries, N.V. might have survived as long as fifteen to twenty minutes.

After his arrest, Appellant gave a video-recorded statement to Detective Carlton Kolbe, an excerpt of which was published to the jury. In the video statement, Appellant said that he went to Tanya's house and she let him in the front door. He said that they had both been drinking and they argued in the living room. He was about to leave but went into N.V.'s room to kiss her goodnight. He said, "I was just going to give a hug and kiss to [N.V.] and the next thing I know I just felt something sharp on my arm and back and the next thing I know there's blood everywhere." He said Tanya then ran from the house and he tried to run after her, but returned to the house "to check myself and see what happened." He said he saw that he had a cut, saw a knife and picked it up, and saw N.V. covered in blood. He carried N.V. to the

living room where he tried to stop the bleeding with paper towels. When Tanya and her mother came back and yelled at him, he told them "I didn't do nothing." He said he pushed Tanya's mother and slapped Tanya and threw the knife at her and asked her "what the fuck is wrong with her." He ran back inside to continue trying to stop N.V.'s bleeding. Appellant said that people were blaming him, but he insisted that he "didn't do nothing."

When Detective Kolbe reviewed the details of the story with Appellant, he asked, "Are you saying Tanya grabbed that knife and cut you with it?" Appellant responded, "I don't know what she did, all I know is that there's . . . it's a knife on [N.V.]'s bed, I'm bleeding. That's when I turned on the light and I saw all of that." Appellant said he turned around and saw Tanya running from the house so he chased her, but then went back to the house. He went into N.V.'s room, turned on the light, and saw that "there was so much blood."

Later, in an interview with a reporter while he was a jail, Appellant said that he had told the police what had happened, that they did not believe him, that they had the evidence, and that "it was all an accident."

## II.  *MENS REA* DETERMINATION

The jury charge instructed the jury that in order to find Appellant guilty, it must determine that he caused N.V.'s death intentionally or knowingly. Appellant objected to the charge and requested separate verdict forms to specify whether the

jury found that Appellant acted intentionally or acted knowingly in causing N.V.'s death. The trial court overruled the objection and denied the request.

In his second point of error, Appellant claims that the trial court erred in failing to require a jury determination, by separate verdict forms, on whether he acted intentionally or knowingly in killing the child. He argues that this determination was necessary because only a finding of intentional conduct will satisfy the "extreme culpability" required for death eligibility. He contends that a "knowing" *mens rea* is a constitutionally insufficient basis for imposing the death penalty. He reasons that because "knowingly" is not the most serious *mens rea* under Texas law, it cannot be characterized as "extreme." Thus, he contends, by permitting a capital conviction based on "knowing" conduct, Texas law fails to ensure that his punishment was based upon a jury determination that he possessed the highest degree of culpability under state law.

Appellant cites *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008), *Roper v. Simmons*, 543 U.S. 551 (2005), and *Atkins v. Virginia*, 536 U.S. 304 (2002). In this trio of cases, the Supreme Court of the United States recognized the principle that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper*, 543 U.S. at 568 (quoting *Atkins*, 536 U.S. at 319); *see Kennedy*, 554 U.S. at 420 (quoting same principle from *Atkins*). In *Roper*,

the Court held that the death penalty cannot be imposed upon juvenile offenders. In *Atkins*, the Court held that it cannot be imposed on intellectually-disabled individuals. The Court reasoned that juvenile and intellectually-disabled offenders had diminished personal culpability, rendering the death penalty disproportionate to their crimes. *Kennedy*, 554 U.S. at 420. In *Kennedy*, the Court vacated a death sentence for an offender who raped but did not kill a child, reasoning that the death penalty was disproportionate to the crime which did not result, or was not intended to result, in the child's death. *Kennedy*, 554 U.S. at 421. None of these cases suggest that a murder committed knowingly cannot support a death sentence.

Appellant acknowledges that a finding of intentionality is not an absolute requirement for death eligibility under party liability cases such as *Tison v. Arizona*, 481 U.S. 137 (1987). In *Tison*, the defendants participated with others in a scheme to break their father out of prison, but they were not the triggermen in four murders that occurred in the course of carrying out the plan. The defendants challenged their death sentences in part on the ground that they did not actually kill the victims and did not specifically intend their deaths. Recognizing that "reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill,'" the Court upheld the death sentences. It reasoned that:

> [T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into

account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Tison*, 481 U.S. at 157–58.

Appellant argues that since *Tison* was decided, there has been a growing consensus against the execution of parties who neither killed nor intended to kill. He uses a law review article as support for his statement that "more than thirty jurisdictions have made legislative or judicial decisions disallowing the death penalty for non-triggermen who lacked the intent to kill." But Appellant is not in the category of a non-triggerman party. He was the sole actor in the instant case; he personally wielded the knife, stabbing five-year-old N.V. in the neck as she lay in her bed.

Moreover, the mental state at issue in *Tison*—reckless disregard by engaging in criminal activities known to carry a grave risk of death—is comparable to our mental state of "reckless," awareness of but conscious disregard of a substantial and unjustifiable risk that the result (here, death) will occur. *See* TEX. PENAL CODE § 6.03(c). In Texas, such a killing is manslaughter. *See id.* at § 19.04. Texas law does not allow for a capital conviction upon a mental state of recklessness but requires the higher culpable mental state of at least "knowledge," awareness that one's actions are reasonably certain to cause death. *See id.* at § 6.03(b). If, under *Tison*, the "reckless" mental state of a non-triggerman party actor suffices as a "highly

culpable mental state" supporting a death sentence, then surely the higher culpable mental state of "knowledge" of a primary actor suffices as well.

None of the Supreme Court of the United States cases cited by Appellant hold or suggest that the culpable mental state of "knowledge" is constitutionally insufficient to support a death sentence. Appellant fails to show that there is a growing consensus among jurisdictions disfavoring death sentences in cases similar to his where the evidence supports a finding that the defendant was the sole actor in causing the victim's death. Appellant argues that a "knowing" mental state is not sufficiently extreme to support death eligibility because it is not the most serious *mens rea* under Texas law. But the United States Supreme Court has never stated that only the highest mental state available under a state scheme would qualify as the "extreme culpability" required for death in that state. Further, the Texas Legislature has determined that, in some circumstances, a culpable mental state of either "intentional" or "knowing" is sufficiently extreme to support a capital murder conviction. TEX. PENAL CODE § 19.03(a).

Appellant also contends that he was entitled to separate jury verdict forms in order to demonstrate that he received a unanimous verdict on intentional conduct.

A Texas jury must reach a unanimous verdict. *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008). This means that they must all agree that the defendant committed one specific statutory crime, but it does not mean that they

must be unanimous in finding that the defendant committed the crime in a specific way. *Id.* at 536.

In *Landrian*, the defendant claimed that he was denied a unanimous jury verdict because the charge allowed the jury to convict him of aggravated assault without unanimously determining whether he (1) intentionally or knowingly caused bodily injury or (2) recklessly caused serious bodily injury. Examining the relevant statutory language, we explained that "[t]he precise act or nature of conduct in this result-oriented offense is inconsequential." *Id.* at 537. Rather, what mattered was "that the conduct (whatever it may be) [was] done with the required culpability to effect the *result* the Legislature has specified." *Id.* (emphasis in original) (quoting *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)). Addressing unanimity in light of the statute's three culpable mental states, we noted that there was "no indication that the legislature intended for an 'intentional' bodily injury assault to be a separate crime from a 'knowing' bodily injury assault or that both of those differ from a 'reckless' bodily injury assault." *Id.* at 537. We further observed that all three culpable mental states were "strung together in a single phrase within a single subsection" and all resulted in the same punishment; they were all conceptually equivalent. *Id.*

Similarly, a finding of either intentional or knowing conduct will support a conviction for capital murder. *See* TEX. PENAL CODE § 19.03(a)(8). The gravamen

of the offense of capital murder is causing the death of a person. *See Gardner v. State*, 306 S.W.3d 274, 302 (Tex. Crim. App. 2009) (recognizing that "the gravamen of capital murder is intentionally (or knowingly) causing a death, plus any one of various types of aggravating elements . . . so long as the same victim is alleged for the predicate murder."); *see also Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (stating that "[m]urder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, e.g., the causing of the death."). Knowingly causing the death of a child under ten and intentionally causing the death of a child under ten both qualify as capital murder. There is no unanimity problem if some jurors found that Appellant committed the offense knowingly while others found that he did so intentionally, as they all found that he committed the offense of capital murder. *See Landrian*, 268 S.W.3d at 537 (explaining that because proof of greater culpable mental state is also proof of any lesser culpable mental state, "it would not matter, for example, if six members found that the defendant intentionally killed his victim and six members found that he had knowingly killed his victim.").

We overrule Appellant's second point of error.

## III. LESSER-INCLUDED OFFENSES

In his third point of error, Appellant contends that the trial court erred by refusing his request to instruct the jury on the lesser-included offenses of manslaughter and criminally negligent homicide.

As applicable here, Texas Code of Criminal Procedure article 37.09(3) defines a lesser-included offense as one which "differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." TEX. CODE CRIM. PROC. art. 37.09(3). We use a two-step test to determine whether an instruction on a lesser-included offense should be given. *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). First, we compare the statutory elements of the alleged lesser offense with the statutory elements and descriptive allegations in the indictment. *Ortiz v. State*, 623 S.W.3d 804, 806 (Tex. Crim. App. 2021) (citing *Ritherson v. State*, 568 S.W.3d 667, 670–71 (Tex. Crim. App. 2018)). Second, we ask whether "there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Id.* (quoting *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016)). The State concedes that manslaughter and criminally negligent homicide are lesser-included offenses of capital murder, resolving the first step. The only question, then, is whether there is some evidence in the record that would permit a jury to rationally find Appellant guilty only of manslaughter or criminally negligent homicide.

Manslaughter occurs when a person recklessly causes the death of another. TEX. PENAL CODE § 19.04. A person acts recklessly with respect to the result of his conduct "when he is aware of but consciously disregards a substantial and unjustifiable risk that. . .the result will occur." *Id.* at § 6.03(c). Criminally negligent homicide occurs when a person causes the death of another by criminal negligence. *Id.* at § 19.05. A person acts with criminal negligence with respect to the result of his conduct "when he ought to be aware of a substantial and unjustifiable risk. . .that the result with occur." *Id.* at § 6.03(d). Thus, Appellant was entitled to an instruction if there was some evidence in the record to permit a jury to rationally find that Appellant engaged in conduct that caused N.V.'s death while being aware of but consciously disregarding a substantial and unjustifiable risk that her death would occur (manslaughter) or while he ought to have been aware of such a risk (criminally negligent homicide).

In his brief, Appellant argues that evidence of recklessness or negligence was raised in his statements to police:

> His interview demonstrates that he had consumed many beers, was aware that Tanya was volatile and angry, aware that there were sharp knives in the house and aware that a sharp cut had just been inflicted on his arm and that he had tussled with Tanya, pushing her and trying to hold her back. [] While [Appellant's] interview demonstrates that he did not have [a] clear recollection of what precisely occurred when "all that happened," a rational jury could have concluded that he either was aware of, but consciously disregarded, the risk that [N.V.] might get hurt, or that he ought to have been so aware.

He also points to his characterization of N.V.'s death as an "accident" and to his statements that he and Tanya fought in the darkened house while intoxicated as evidence raising the lesser included offenses.

Appellant does not identify what conduct he engaged in that resulted in N.V.'s death or explain how the evidence he relies on had any bearing on conduct he engaged in that resulted in N.V.'s death. And it is not obvious from the evidence exactly what substantial and unjustifiable risk was present that he was aware of or ought to have been aware of but disregarded when engaging in that conduct. These facts—two people drinking too much and arguing in a darkened house—do not present a substantial and unjustifiable risk that a third person will be stabbed in the neck while sleeping in another room. Neither does the presence of a knife in a kitchen drawer within the house present a substantial and unjustifiable risk that it would be used to stab a child asleep in the house. Even Appellant's claimed awareness that Tanya had a knife and had cut him with it does not present some evidence of a risk that Appellant's conduct would result in N.V.'s death from that knife. Nor does Appellant's claim that Tanya was volatile and angry raise evidence of a substantial and unjustifiable risk that Appellant's conduct would result in N.V.'s death. At the scene and in his statement to the police, Appellant suggested that Tanya was solely responsible and that N.V.'s injuries were a surprise and a mystery to him. His single unsupported comment to a reporter that "it was all an accident," which

does not identify what "it" was, does not amount to evidence showing that his conduct resulted in N.V.'s death due to a substantial and unjustifiable risk of which he was aware but disregarded or of which he should have been aware. The trial court properly denied Appellant's requested instructions on the lesser-included offenses. We overrule point of error three.

## IV.     IMPEACHMENT EVIDENCE

During the punishment phase, Tanya testified about a November 2013 incident in which Appellant forced his way into her house, then beat and choked her until she urinated on herself and lost consciousness. She said that when she regained consciousness, she tried to leave with N.V. in her car, but Appellant had slashed her tires. She testified that Appellant again grabbed her by the throat and threw her on the ground, and she lost consciousness a second time, just as the police arrived. Photographs of her injuries from this incident were admitted into evidence.

Tanya also testified about N.V.'s life. She said that N.V. had loved music, singing, watching movies, and playing the guitar. She showed a photo of N.V. hunting for Easter eggs with cousins and a photo of N.V.'s graduation from pre-kindergarten. Tanya testified that, as a result of N.V.'s death, she was diagnosed with PTSD and that she could barely work.

On cross-examination, Tanya testified that she had a son who moved out when he was sixteen to live with her parents. She was uncertain whether he was now

twenty-one or twenty-two. She stated that she had not spoken with her son in a year and a half, and agreed that they did not have a good relationship. She admitted to an October 2013 domestic violence incident with Appellant in which police listed Appellant as the victim and Tanya as the aggressor. Tanya insisted that she only struck Appellant in self-defense, but conceded that police did not believe her. She further conceded that she had hit Appellant on other occasions, and that there was "a history" of her hitting him, but she said it was always in self-defense. She also agreed that there was "a history of the police not believing" her and that she and Appellant had "been violent with each other in the past."

Appellant also sought to question Tanya about two domestic violence incidents between Tanya and other partners, one in 2008 and another in 2017, in which police did not believe Tanya's version of events, instead believing that she was the aggressor. Appellant further sought to present evidence that Tanya had used a knife and a belt against her partner in the presence of her son in the 2008 incident, and had used the knife on herself in an effort to place the blame on her partner. Finally, Appellant sought to present evidence of Tanya's substance abuse at the time of N.V.'s birth by questioning her about whether illegal substances were detected in N.V.'s blood at birth, and about past interactions with Child Protective Services. Appellant argued that the jury had been left with a false impression of Tanya. He also argued that the evidence was relevant to rebut Tanya's testimony that she was

suffering from PTSD and anxiety as a result of N.V.'s murder, and to rebut the picture Tanya had presented of N.V.'s childhood. Appellant made offers of proof and argued that the evidence was admissible under the Fourteenth, Sixth, and Eighth Amendments. The trial court ruled the evidence irrelevant and inadmissible. In his fourth point of error, Appellant claims that the trial court erred in preventing him from impeaching Tanya at the punishment phase with evidence of instances of her past conduct, in violation of Texas law and the Sixth, Eighth, and Fourteenth Amendments.

Texas Rule of Evidence 608(b) generally prohibits impeachment with evidence of specific instances of conduct other than final convictions, but Appellant argues that when a witness has created a false impression of character, then such evidence is admissible to rebut that false impression. *See King v. State*, 773 S.W.2d 302, 303 (Tex. Crim. App. 1989). Otherwise inadmissible evidence may become admissible when a party opens the door by creating a false impression with the jury, inviting a response. *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009).

But the jury was not left with a false impression of Tanya's character in light of her direct examination as a whole and the cross-examination that was allowed. Tanya admitted during guilt/innocence that she had been drinking and had marijuana in her system on the night of the offense. Appellant's punishment phase cross-examination of Tanya showed that she contributed to the violence in her relationship

with Appellant. She admitted that a violent incident with Appellant occurred a month before the November 2013 incident in which police believed she was the aggressor. She agreed that she had a history of hitting Appellant, that they had both been violent with each other, and that police did not always believe her version of events. A defense expert testified that in his opinion, Appellant and Tanya "had a toxic, dysfunctional relationship that was tumultuous for quite some time, and they were coming and going from both — both sides[,]" and that "[t]hey both had engaged [in] and . . . perpetrated verbal and physical fights with each other." Tanya's punishment phase cross-examination also revealed her estrangement from her son. Thus, the evidence showed that there was violence on both sides of the relationship, that Tanya did not have a good relationship with her son who left home of his own accord at sixteen, and that on the night of the offense Tanya was drinking alcohol and using marijuana while responsible for the five-year-old child. The absence of the requested additional extrinsic evidence did not leave the jury with a false impression of Tanya's character.

Appellant argues that the trial court's rulings violated the Fourteenth and Sixth Amendments by preventing him from presenting a meaningful and complete defense at sentencing and demonstrating that Tanya also bore some responsibility for what happened. He relies on *Green v. Georgia*, 442 U.S. 95 (1979), to support his

argument that he was not able to fully present a defense because the trial court limited his cross-examination of Tanya.

Green and his codefendant were both indicted for the murder of the same victim and were tried separately. At sentencing, Green tried to introduce the testimony of a witness from his codefendant's trial. This witness had testified that the codefendant had confided to him that he had killed the victim, shooting her twice, while Green was not present. The trial court excluded the testimony as inadmissible hearsay. The State, arguing for a capital sentence, urged the jury to infer that Green participated directly in the killing because the victim was shot twice. The Supreme Court held that despite any violation of hearsay rules, excluding the testimony given in the codefendant's trial violated Green's due process rights. *Id.* at 97. The Court observed that the excluded testimony was "highly relevant to a critical issue" in Green's punishment trial and emphasized the reliability of the testimony, considering that it was a statement against interest made to a close friend. In these unique circumstances, the Court held that excluding the testimony deprived Green of a fair punishment trial.

The instant case is not analogous. Here, the sought-after testimony concerned the character of the victim's mother, not a codefendant's statement against penal interest. And although Appellant says that Tanya "bore some responsibility for what happened," he provides no argument or evidence in support of that assertion.

Appellant also contends that the trial court's exclusion of the evidence about Tanya's past conduct deprived him of the constitutionally-required "individualized sentencing" described in *Lockhart v. Ohio*, 438 U.S. 586, 604 (1978). He asserts that *Lockhart* allows "the introduction of 'any aspect of . . . the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Appellant's Br. at 56 (quoting *Lockhart*, 438 U.S. at 604) (citing as support *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(1)). But Appellant does not explain how evidence about Tanya's character or evidence related to Tanya's past conduct with her son and other partners—or even with Appellant on other occasions—illuminated "the circumstances of the offense" (here, N.V.'s murder). Excluding evidence related to the victim's mother's character and prior activities did not unconstitutionally infringe on Appellant's right to individualized sentencing.

The trial court acted well within its discretion by excluding the proffered impeachment evidence related to Tanya's past conduct. We overrule point of error four.

## V.    CHALLENGES FOR CAUSE

In points of error one and five, Appellant complains that the trial court erroneously granted one of the State's challenges for cause and erroneously denied a number of Appellant's challenges for cause.

A venire person is challengeable for cause if he has a bias or prejudice against the law upon which either party is entitled to rely. *Buntion v. State*, 482 S.W.3d 58, 84 (Tex. Crim. App. 2016). The test is whether the bias or prejudice would substantially impair the venire person's ability to perform his duties in accordance with the court's instructions and the juror's oath. *Id.* (citing *Wainwright v. Witt*, 469 U.S. 412 (1985)). The law must be explained to the venire person, and he must be asked whether he can follow the law regardless of his personal views. *Tracy v. State*, 597 S.W.3d 502, 512 (Tex. Crim. App. 2020). The challenger bears the burden of demonstrating the venire person's impartiality and does not meet this burden until he has shown that the venire person understood the law's requirements and could not overcome his prejudice well enough to follow the law. *Id.* Likewise, under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and its progeny, the proper standard for determining when a venire person may be excluded for cause because of his views on capital punishment is whether those views would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and oath. *Witt*, 469 U.S. at 424; *see Davis v. State*, 313 S.W.3d 317, 343 (Tex. Crim. App. 2010). A venire person's bias need not be proven with "unmistakable clarity" because sometimes a venire person simply cannot be asked enough questions to reach a point where his bias has been made "unmistakably clear." *Buntion*, 482 S.W.3d at 84.

When assessing a trial court's ruling on a challenge for cause, we review the entire record to determine whether sufficient evidence exists to support the court's ruling. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). We reverse only for a clear abuse of discretion. *Id.* Because the trial judge is best-positioned to evaluate a venire person's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference. *Gardner*, 306 S.W.3d at 295. When a venire person's answers are vacillating, equivocating, ambiguous, unclear, or contradictory, we accord particular deference to the trial court's decision. *Tracy*, 597 S.W.3d at 512.

## A.    State's Challenge for Cause

In point of error one, Appellant claims that the trial court erroneously granted the State's challenge for cause against venire person K. Schneider, in violation of *Witt*.

On her juror questionnaire Schneider agreed with the statement, "I believe that the death penalty is appropriate in some capital murder cases, but I could almost never return a verdict which assessed the death penalty." When questioned about that response by the prosecutor, Schneider said that she had talked to her minister and confirmed that her church did not have a doctrine against the death penalty, but nonetheless, she was "not sure [she] could deliver a capital murder punishment as far as that sentence." When asked if she could ever answer the punishment special

issues in a way that would result in the death penalty, Schneider responded, "I don't know if I could." However, after the prosecutor gave a detailed description of the punishment phase and the special issues, including the requirement that jurors follow the law based on the evidence, Schneider said "yes" and "I think so, yes," she would be able to affirmatively answer the future dangerousness special issue.

Turning to the mitigation special issue, the prosecutor asked Schneider whether she would "always lean towards answering, yes" and Schneider responded, "I don't think so." When the prosecutor again asked if Schneider could answer "yes" to the future dangerousness special issue if the State proved it, she stated, "Yes. I think so." She stated, "I think I could, yes," in response to the prosecutor's question as to whether she could answer the mitigation special issue "no" if she believed there were not sufficiently mitigating circumstances to spare the defendant's life. Later, as she was trying to wrap up, the prosecutor asked, "[C]an you give us an affirmative or a negative yet on whether you would ever be able to answer Special Issue 2, no, no matter the evidence?" Schneider responded, "I—I think I could. . . I probably, yes, I would, of course. And so I—I think I could answer, yes." There was some confusion about whether the prosecutor was asking her if she could answer "yes" or "no" to the mitigation special issue. The prosecutor clarified the mitigation special issue and then again asked if Schneider "would . . . always say, yes, no matter what, or would there ever be a time when [she] could say . . . no" to the mitigation special

issue. Schneider said, "Yes. I think so, yes. Yes, I could say, no, . . . let me just read that again just a minute." Then, perhaps confused, she said, "Yes, I could say—I could say, yes, to that." The prosecutor responded, "I know. Could you ever say, no?" Schneider responded, "Could I ever say, no? Okay. You know, I—probably not. I think with my wishy-washiness on whether I can or not, I think maybe I could not." The prosecutor followed up, asking, "So if—you believe there would probably never be evidence that would satisfy you in your mind that you would answer this, no?" Schneider responded, "Probably not."

When initially asked by defense counsel whether she could see herself "saying, death" on the mitigation special issue, Schneider responded, "[W]hen it came right down to it, no. After the questions [the prosecutor] asked, I don't know now." Defense counsel asked again, "[C]an you, in your mind, picture a circumstance where you could say, death?" Schneider responded, "I should probably just say, no, if I can't outright say, yes." When further questioned by defense counsel as to whether there could be any "conceivable circumstance" in which she could answer the mitigation special issue in such a way that would result in death, Schneider responded, "I think so." Defense counsel queried again whether there was "a circumstance in your mind where you could consider death?" Schneider responded, "I think so, yes." Finally, defense counsel asked, "[I]f you ultimately decide that the appropriate punishment was the death penalty, would you vote your

conscience and impose the sentence that you—if you decided that that was the appropriate one?" She responded, "Here we go again. I think I would, yes."

The State challenged Schneider for cause on the ground that her beliefs would prevent her from considering the full punishment range. The court granted the State's challenge. The next day, the trial court *sua sponte* made the following comments on the record:

> I kept trying to reconcile in my mind the difference between [K.] Clanton, the next to last person yesterday, and the last person yesterday[, K. Schneider]. . . . [a]nd I had it figured out yesterday and the result was I put—I qualified [K.] Clanton, but granted the—somebody's motion to challenge [K.] Schneider.
>
> I probably should have kept both of them, bottom line. I didn't. I can't get one of them back. So I am going to reverse myself and grant the Defense's challenge to [K.] Clanton. So [K.] Clanton and [K.] Schneider are both off.

Appellant argues that Schneider did not categorically state that she would automatically answer the issues in a way that life imprisonment would result, or that she could not envision circumstances in which she would answer the special issues so as to result in a death sentence. Appellant contends that Schneider could follow the law even though she was not an enthusiastic supporter of the death penalty. Appellant emphasizes the trial court's reflections the day after Schneider's voir dire and says the trial court correctly recognized its own error in granting the State's challenge.

During her voir dire, Schneider shifted from saying that she could not return a verdict that would result in death to saying that she "thought" she could or "probably" could. Even then, she hedged, saying that she "didn't know" and that probably she should just say no. Although defense counsel solicited a few responses indicating that she could answer the issues in a way as to result in a death sentence, Schneider always qualified her answer by saying "I think" or "probably." This contrasts with the tenor of her responses when asked whether she could answer in a way as to result in a sentence of life without parole; those queries generally elicited an unqualified "yes." While the trial court second-guessed its ruling the following day in light of another venire person's voir dire, the court did not indicate that it had reviewed the record of Schneider's voir dire. The court's uncertainty in hindsight highlighted the difficulty of getting a firm handle on Schneider's position. At best, Schneider was "persistently uncertain about [her] ability to follow the law." *Russeau v. State*, 171 S.W.3d 871, 778 (Tex. Crim. App. 2005). Given Schneider's consistently qualified and vacillating responses, Appellant has not shown that the trial court abused its discretion in granting the State's challenge. *See Buntion*, 482 S.W.3d at 91. We overrule Appellant's first point of error.

**B.     Appellant's Challenges for Cause**

In point of error five, Appellant contends that the trial court erred in denying his challenges for cause to venire persons R. Dehnel, S. Ellwanger, M. Kennedy, J.

Rainey, R. Reece, C. Hodges, R. Rodriguez, J. Webb, D. Hinojosa, G. Reed, and G. Hodapp. He argues that the trial court's failure to grant these eleven challenges for cause "resulted in a jury being chosen that could not afford [Appellant] a fair trial."

Appellant made eleven challenges for cause that were denied.[2] In exercising his fifteen peremptory challenges,[3] Appellant struck nine of the eleven venire persons who are the subject of this point of error, in addition to six other venire persons whom he does not now complain about. He then requested nine additional peremptory challenges based on the nine previously challenged venire persons whom he struck. The trial court asked Appellant to identify "somebody on the jury that you would otherwise object to" and "that you're forced to take now on the jury." Appellant identified two objectionable jurors "that would be seated without granting these additional peremptories," Ellwanger and Webb. The trial court asked Appellant if he would strike Ellwanger and Webb if the court granted additional peremptory challenges. Appellant replied, "no," because the strike line would shift with the granting of additional peremptory challenges, and he "would exercise those against other persons." Appellant did not identify the "other persons." The trial court

---

[2] In total, Appellant made fourteen challenges for cause that were denied, but only eleven were in the strike zone.

[3] Parties in capital cases are allotted fifteen peremptory challenges each. Art. 35.15(a).

granted Appellant two additional peremptory challenges. He did not use them to strike Ellwanger and Webb, and they sat on the jury.

Before we grant relief on a claim that the trial court erred in denying a defense challenge for cause, the defendant must establish certain prerequisites for showing harm.[4] Harm in this context depends on "whether a peremptory challenge was wrongfully taken from the defendant." *Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004) (internal quotation marks and alterations omitted). Therefore, a defendant must show on the record that (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire person; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Comeaux v. State*, 445 S.W.3d 745, 750 (Tex. Crim. App. 2014).

### 1. Venire persons S. Ellwanger and J. Webb

---

[4] At times this Court has characterized the requisite steps as necessary for preserving error. *See Buntion*, 482 S.W.3d at 83; *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010); *Lewis v. State*, 911 S.W.2d 1, 4 (Tex. Crim. App. 1995). At other times we have characterized them as necessary for establishing harm. *See Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014); *Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011); *Newbury*, 135 S.W.3d at 305 n.36. We have noted the conflation of these concepts. *See Johnson v. State*, 43 S.W.3d 1, 6 n.6 (Tex. Crim. App. 2001) (stating, "In the past we have confused preservation of error and harm issues within the context of an erroneous denial of a challenge for cause."). As a result, we indicated that the characterization of these requirements "as involving preservation of error . . . has fallen out of favor." *See Nava v. State*, 415 S.W.3d 289, 305 n.36 (Tex. Crim. App. 2013).

Appellant claims that the trial court abused its discretion in denying his challenges for cause to venire persons Ellwanger and Webb. However, as set out above, he did not use peremptory challenges against Ellwanger and Webb. Because he did not, he fails to comply with the prerequisite steps for showing harm from any error in the trial court's denial of his challenges for cause against Ellwanger and Webb. *See Johnson v. State*, 43 S.W.3d 1, 5–6 (Tex. Crim. App. 2001) (stating that defendant must show, among other things, that he used a peremptory challenge to remove a venire person whom he claims should have been removed for cause); *see also Newbury*, 135 S.W.3d at 32.

## 2. Remaining venire persons[5]

---

[5] There appears to be a discrepancy in the language used in our prior cases regarding the proof required to meet the fourth and fifth prerequisites for showing harm from an allegedly erroneous denial of a challenge for cause. Some of our opinions present the prerequisite steps in list form without explicitly requiring a connection between the requested (and denied) additional strike and an identified objectionable juror. *See, e.g.*, *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010); *Mathis v. State*, 67 S.W.3d 918, 922 (Tex. Crim. App. 2002); *Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996). However, some language in our opinions indicates that a defendant's request for an additional strike must be tied to an identified objectionable juror. Rather than making a general request for additional strikes, the defendant must identify a specific juror as objectionable and request an additional strike to use on that specifically identified objectionable juror, *see, e.g.*, *Nava*, 415 S.W.3d at 305, *Davis v. State*, 313 S.W.3d 317, 343 (Tex. Crim. App. 2010), or he must identify an objectionable juror whom he would remove with an additional strike, *see, e.g.*, *Comeaux*, 445 S.W.3d at 750; *Martinez v. State*, 17 S.W.3d 677, 682 (Tex. Crim. App. 2000); *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex. Crim. App. 1986).

Under the language that lists the prerequisite steps generally, Appellant has arguably satisfied the requisite steps for showing harm, thus prompting a review of the trial court's denial of his challenges for cause. It is less clear whether, under the language requiring a nexus between the defendant's request for an additional strike and an identified objectionable juror, Appellant has satisfied the prerequisites necessary to warrant review of the denied challenges for cause. In an abundance of caution, we will assume without deciding that Appellant complied with the

We now turn to the remaining nine venire persons at issue in this point of error, against whom Appellant did use peremptory strikes. Because the trial court granted Appellant two additional peremptory challenges, he cannot show harm unless he demonstrates that the trial court should have granted at least three of his challenges to these nine venire persons. *See Comeaux*, 445 S.W.3d at 749–50.

### a.        Venire person R. Dehnel

Appellant claims that the trial court abused its discretion in denying his challenge for cause against Dehnel because she would not have been an impartial juror due to her prior acquaintance with the victim's mother, Tanya Bermea. Seating Dehnel, Appellant argues, would have impaired the heightened reliability required in a death penalty trial.

Dehnel, a middle school teacher, indicated on her juror questionnaire that she knew Tanya. When asked during voir dire if she remembered Tanya, Dehnel responded:

> Well, Tanya was memorable. I also—the reason I know Tanya, she was one of my athletes. When I taught at Lee Junior High School, I also coached, and those are a little different relationships than sitting in a classroom. And when this all happened and came out in the news and I saw her name and I thought, I wonder if I know that person. And so I went and pulled out my yearbook and went, that name matches . . .

---

prerequisite steps necessary to warrant review of the denied challenges for cause against the remaining venire persons.

Dehnel agreed with the prosecutor that she could fairly judge Tanya if she were to testify. Defense counsel asked if Dehnel knew Tanya "to be an honest person," and Dehnel responded, "I haven't known her since she was about in seventh or eighth grade, and that would have been in early 2000, late 1990s, so . . . it's been a long time." She then agreed with defense counsel that if Tanya were to testify she would "start her off at an even level" with other witnesses. Defense counsel did not further question Dehnel about Tanya or her ability to be impartial were Tanya to testify.

Appellant cites *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998), to argue that Dehnel was challengeable for cause because she could not impartially judge the credibility of a witness. *Jones* does not support Appellant's position. There, the venire person stated that she would be "more skeptical" of accomplice witnesses but could accept an accomplice witness's testimony if she believed that individual. *Jones*, 982 S.W.2d at 390. We explained that litigants are entitled to jurors who are "open-minded and persuadable, with no extreme or absolute positions regarding the credibility of any witness." *Id.* The venire person at issue in *Jones* was not challengeable for cause simply because she said she would be more skeptical of accomplice witnesses than other witnesses; she expressed no extreme or absolute position regarding the credibility of accomplice witnesses. *Id.* Likewise, Dehnel expressed no extreme or absolute position regarding Tanya's credibility. To the

contrary, she said that she could judge Tanya fairly as a witness, that she had no preconceived notions regarding her honesty, and that she would "start her off at an even level" with other witnesses.

Appellant also argues that seating Dehnel "on a jury that decided the fate of a man convicted of killing her former student's child" would deprive him of the sentencing reliability required for capital cases under the Eighth Amendment, citing *Beck v. Alabama*, 447 U.S. 625, 637–38 (1980). There was no Eighth Amendment problem presented by seating Denhel who testified that she would judge Tanya fairly and on par with all other witnesses.

For the above reasons, the trial court did not abuse its discretion by denying Appellant's challenge for cause against Dehnel.

### b.    Venire person M. Kennedy

Appellant claims that the trial court abused its discretion in denying his challenge for cause to venire person Kennedy on the ground that she would improperly shift the burden of proof to Appellant by expecting Appellant to testify.

When the defense asked Kennedy "whether life without the possibility of parole would ever be enough punishment for a guilty child killer," Kennedy responded that she "would want to hear the other side of the story" before deciding. She further explained that if she were the accused, she "would want someone to listen to me," and that "until I hear that other side of the story or until evidence is

proved or, you know, circumstances are laid out, I guess—You know, until the story is told . . . I don't know what the right punishment is." When defense counsel reminded Kennedy that Appellant had the right not to testify and that the defense had no burden of proof at all, she replied that she would just "like to know as much information and gather as much as you can if you are talking about taking somebody's life." She also said, "I would like to hear as much as I could from both sides. Maybe something that was said or maybe something, you know that you said would be, you know, maybe mitigating . . ." Defense counsel clarified, "at this point we are just deciding whether or not someone is guilty" and further, "what I am hearing you say is if you don't hear anything from us you're already going to be leaning toward the death penalty as the appropriate punishment. Fair enough?" Kennedy disagreed, saying, "Not toward the death penalty, per se." Kennedy reiterated that she would just like "to hear as much information as [she] could." When defense counsel suggested to Kennedy that it would be really hard for her to decide if a defendant would be a future danger if the defense never presented any evidence, Kennedy disagreed and said, "I guess they'd have to prove why he is. . .So if you're not going to prove that he is not, they better prove that he is."

Kennedy did not say that she would place a burden of proof on Appellant or that she would hold it against him if he did not testify or otherwise present any evidence. Appellant did not ask Kennedy whether she would be unable to follow the

law which does not require Appellant to testify. *See Tracy*, 597 S.W.3d at 512 (stating that before venire person can be struck for cause, law must be explained to him and he must be asked whether he can follow the law regardless of his personal views). Appellant fails to show that Kennedy had a bias or prejudice against the law that she would be unwilling or unable to put aside.

Appellant also claims that the trial court should have granted his challenge to Kennedy on the ground that she would be substantially impaired as a juror who had children close in age to the victim. Kennedy, a mother to twin nine-year-olds and a five-year-old, stated on her questionnaire that it would be difficult for her to serve in this case, as a mother of three young children. She agreed during voir dire that it would be difficult to look at crime scene and autopsy photos of the child victim. Kennedy testified that when she heard in the media that the case involved the murder of a child, she decided that she did not want to follow the story: "You don't want to follow a case like that. . . As a parent . . . you're like, 'Oh gosh, no.' Things like that don't happen." But when defense counsel suggested to Kennedy that it would be difficult for her to be fair and impartial as a juror because of her children, Kennedy disagreed:

> Q. It's going to be very, very difficult to be the fair and impartial kind of juror that you want to be in this case, isn't it, because of your children?

A. No. I don't —I mean I don't think because of my children or because of my views. You know, I—I don't think it's going to be hard to be fair and impartial. I think it's going to be hard to take this in. . . . That wouldn't determine my moral compass, whether or not I could be fair or not be fair. That's just—I mean that's gut wrenching. That's a hard thing to see. That's a hard thing to absorb as a parent and as a mother. . . I would say "no." No, it's not going to—No, at all, it doesn't determine me being fair or not. It's just going to be—that would be very hard.

As explained above, to prevail on a challenge for cause, Appellant must show that the challenged venire person demonstrated a bias or prejudice against the law that she could not put aside (i.e., that Kennedy understood the law but could not overcome her bias). While Kennedy acknowledged that as a mother, it would be emotionally wrenching to sit on a case involving a child victim, she consistently maintained that she could be fair and impartial in carrying out her oath and following the law, however hard it might be. Appellant fails to show that the trial court abused its discretion in denying his challenge to Kennedy.

### c.      Venire person C. Hodges

Appellant claims that the trial court abused its discretion in denying his challenge for cause to venire person Hodges on the grounds that Hodges would not assess witness credibility impartially, would automatically vote for a death sentence, would shift the burden of proof to the defense on the future dangerousness special issue, and would not consider mitigation evidence.

Hodges testified that he had worked in federal and state law enforcement for more than twenty-four years and that he knew two of the State's potential witnesses, Gary Cole and Tommy Williams, both employed by the sheriff's department. Hodges and defense counsel had the following exchange regarding these witnesses:

Q. Does Mr. Cole have a reputation for honesty?

A. Yes.

Q. And you believe what Mr. Cole has to say?

A. Yes.

Q. And if Gary Cole was to take the stand and also a homeless person were to take the stand, Gary Cole would have more credibility in your eyes?

A. Yes.

Q. Okay. And I'll ask for Deputy—for Tommy Williams, also. If Tommy Williams—I guess first off, does he have a reputation for honesty?

A. Yes, sir.

Q. Okay. And with that being said, if he were to take the stand and a homeless man were to take the stand, just based on what your personal knowledge is of that person before either one of them said a word, Mr. Williams would have more credibility in your eyes?

A. Yes.

Based on this exchange, Appellant says Hodges was challengeable for cause because he would unequivocally believe the testimony of the two law enforcement officers whom he knew.

A venire person who cannot impartially judge the credibility of the witnesses is challengeable for cause for having a bias or prejudice. *Feldman v. State*, 71 S.W.3d 738, 745 (Tex. Crim. App. 2002). As stated previously, a defendant is entitled to jurors who will be genuinely open-minded and subject to persuasion, with no extreme or absolute positions. *Jones*, 982 S.W.2d at 390; *Feldman*, 71 S.W.3d at 745. But the fact that a venire person is more or less skeptical of a particular category of witnesses does not make him subject to a challenge for cause. *Feldman*, 71 S.W.3d at 744. In *Feldman*, the venire person testified that he would "lean toward" believing a police officer over a lay person but would have to see both witnesses on the stand. The fact that he was less skeptical of police officers than lay witnesses did not make him challengeable for cause. *Compare id*. (holding that equivocal statements by potential jurors did not support a conclusion that venire members were biased as a matter of law), *with Hernandez v. State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978) (holding that venire person who said she would *always* believe police officer witnesses was challengeable for cause). We have recognized that jurors cannot possibly be "completely impartial and free of any trace of skepticism toward any category of witness." *Jones*, 982 S.W.2d at 390. "No person sitting as a juror

can completely remove his own experiences, beliefs, and values, however hard he may try." *Id.*

Hodges did not possess particular views about a category of witnesses, but about two individual witnesses whom he personally knew. However, defense counsel did not ask Hodges whether, despite personally knowing the witnesses and believing them to be honest and credible, he could put that bias aside and judge their credibility fairly and with an open mind. Appellant fails to show that Hodges harbored witness bias that he would be unable to put aside despite the law's requirements. *See Tracy*, 597 S.W.3d at 512 (stating that challenger does not meet burden of showing venire person's bias until he shows that venire person understood requirements of law and could not overcome personal prejudice well enough to follow them).

Appellant also says Hodges was challengeable for cause because he "would have voted for the death penalty automatically." *See Banda v. State*, 890 S.W.2d 42, 57 (Tex. Crim. App. 1994) (stating venire person is challengeable for cause where he would automatically answer in such a way as to vote for death). Examination of Hodges's voir dire as a whole does not support this claim.

When questioned by the State, Hodges agreed that if the jury found Appellant guilty of intentionally killing a child under ten, he would be able to evaluate all of the evidence and answer the future dangerousness special issue either way,

depending on the evidence. When defense counsel questioned Hodges generally about whether life without parole could be an appropriate punishment for a "child killer" who had no legal defenses, Hodges responded that it would "depend upon the circumstances," that "life without parole could be a fitting punishment for that crime as well as the death penalty," and that life without parole could be a suitable punishment because it "would prevent you from committing more heinous crimes like more child murders." Defense counsel then asked Hodges what penalty would be appropriate for a "child killer" who had no legal defenses and after a finding of yes on the future dangerousness special issue, and Hodges stated that the death penalty was the only appropriate punishment in those circumstances "unless you have some really good evidence to make me believe your way."

Appellant has not shown that Hodges "would automatically vote for death" upon a finding of future dangerousness. Hodges's agreement that death was the only appropriate punishment for a defendant who killed a child and was also found to present a future danger unless there was "some really good evidence" is not the same thing as saying he would "automatically vote for death" without considering mitigation evidence.

When questioned by the prosecutor about the mitigation special issue, Hodges agreed that, even if he found the defendant guilty of intentionally killing a child and also found him to be a future danger, he would be able to "think back through all the

evidence, conduct a fresh analysis," and decide the mitigation special issue either way depending on the evidence. When defense counsel attempted to question Hodges about whether there was any mitigation evidence that would overcome a guilty verdict and an affirmative finding on the future dangerousness issue, Hodges expressed confusion about the question, asking multiple times for clarification and rephrasing of the question. The trial court also asked for clarification. Finally, Hodges and defense counsel had the following exchange:

> Q. Is there any circumstance that you could consider that would lead to a life verdict in the event that you found somebody again with—
>
> A. With all of the other elements [, guilty of intentionally killing a child and a finding of future danger]—
>
> Q. Yes, sir.
>
> A. —met?
>
> Q. Yes, sir.
>
> A. Then I would say that I would vote for the death penalty in that scenario.
>
> Q. And there is no mitigating circumstance that would call for a life sentence in that, right?
>
> A. Well, in that scenario we have stated that all those other elements were met, correct?
>
> Q. Yes, sir, that's correct.
>
> A. So, yes, I would have to go to the—I would have to vote for the death penalty.

Appellant suggests that Hodges would "automatically vote for death" based upon his agreement that he would not find any evidence sufficiently mitigating to overcome a guilty verdict and future dangerousness finding. However, defense counsel did not remind Hodges of the law regarding mitigation evidence—that jurors must be willing to at least consider a defendant's background and character in answering the mitigation evidence, (although they need not give mitigating weight to any particular type of evidence)—and ask whether or not he would be able to follow that law even if there were affirmative findings on guilt and future dangerousness. *See Tracy*, 597 S.W.3d at 512. Further, during his voir dire by the State, Hodges agreed that even after a finding of guilt for intentionally killing a child and also a finding of future danger, he would be able to "think back through all the evidence, conduct a fresh analysis" and decide the mitigation special issue either way depending on the evidence. Hodges's responses vacillated depending upon who was asking the questions. *Id.* (stating that when venire person's answers are vacillating, we afford particular deference to trial court).

Finally, Appellant contends the trial court erred in denying his challenge to Hodges on the ground that he would shift the burden of proof to Appellant on the future dangerousness special issue. Appellant relies on the following exchange during defense counsel's voir dire of Hodges:

Q. Okay. And let's say [the State] get[s] into the future danger question.

A. Okay.

Q. And they say, "We're not going to put on any evidence" and we say, "We are not going to do anything." At that point does the State get that bar lowered from beyond a reasonable doubt?

A. If they don't meet the requirement for the danger, then, yes, I would say it would be lowered.

This exchange does not establish that Hodges understood the requirements of the law and could not or would not follow them. Counsel did not remind Hodges that the burden of proof on the first special issue is on the State and ask him whether or not he would be able to follow that law. It is not at all clear that Hodges understood what defense counsel meant by "get[ting] that bar lowered," and Hodges did not state that he would therefore place any burden on Appellant. Appellant fails to show that Hodges would have shifted the burden of proof to Appellant on the future dangerousness special issue based on the above exchange. The trial court did not abuse its discretion in overruling Appellant's challenge for cause to Hodges.

### d. Venire person R. Reece

Appellant challenged venire person Reece in part on the ground that she leaned heavily toward the death penalty. He argued that upon making an affirmative finding on the first special issue, Reece would lean so heavily toward the death penalty that "with no burden of proof on Special Issue No. 2, . . . it is almost as good

as an automatic death penalty." On appeal, he argues that Reece was challengeable for cause because she would automatically "vote for the death penalty." The record does not support Appellant's view of Reece.

While Reece expressed the view that the death penalty is sometimes appropriate, she also expressed her belief that life without parole is a severe penalty. She stressed that making a decision on punishment was not one that she would take lightly, and that it was "a heavy burden" for jurors. The prosecutor asked Reece whether, addressing the mitigation special issue after a finding of future danger, she would "automatically make a decision" or would consider all of the evidence. She responded that she "would certainly try to consider all of the evidence." The prosecutor pressed her on what she meant by "try" and she said, "Well, I just think the whole—this whole process is a very intense and important thing and so, you know, I would just do my best to find the right answer that I felt was right." The prosecutor further asked, "So when you say 'try,' you're not saying that you couldn't consider all the evidence? You're not saying you would make an automatic decision; you're just saying that you would take excruciating efforts to consider all the evidence?" Reece agreed, saying, "Yes. Yes."

When asked by defense counsel what her "feelings" were about the appropriate punishment for the murderer of a child under the age of ten, Reece said "I can see going either way. It's just—I believe in the death penalty, but life in prison

without parole is a severe punishment." Defense counsel then asked Reece her "feelings" about the appropriate punishment for a person who is found guilty of murdering a child under the age of ten and who has also been found to present a future danger. He stressed, "[w]e are not talking about any of the mitigation stuff right now . . . [w]e are just talking about after those two things." Reece agreed that the death penalty is "a fair penalty" in those circumstances. When defense counsel then questioned whether, after a finding of guilt on facts similar to those alleged in this case and a finding of future danger, there would ever "be enough mitigation to warrant a sentence of life without the possibility of parole instead of the death penalty," Reece said yes. She explained that circumstances, such as "how a person is raised and how he is treated and the things that have happened to him in his life do make a difference" and should be considered in assessing punishment. Defense counsel asked whether, before answering the mitigation question, Reece would be leaning toward death. Reece responded, "[p]robably, yes." And further, "[u]nless some horrific something was presented to me as to why he was that way, then, yes, I probably would lean to the death penalty." Reece's responses reflect that she believed the death penalty is appropriate in some cases, but not in every case, and that she would not automatically answer the special issues in such a way that resulted in a death sentence but would consider all of the evidence before answering both of the special issues.

Appellant also says Reece was challengeable on the ground that she would not consider evidence of substance abuse in assessing mitigating evidence. When asked whether she viewed evidence of substance abuse to be mitigating, Reece stated that "[s]ubstance abuse is a choice by the people who do that, so whatever they do under the influence of that substance they have chosen." She agreed that she would not find substance abuse to be mitigating evidence.

Appellant concedes that this Court has held that a venire person's statements that they would not consider a certain type of evidence to be mitigating does not render them subject to removal for cause. *See Soria v. State*, 933 S.W.2d 46, 65 (Tex. Crim. App. 1996); *Heiselbetz v. State*, 906 S.W.2d 500 (Tex. Crim. App. 1995). But Appellant says that these holdings cannot be squared with Supreme Court precedent, citing *Penry v. Lynaugh*, 492 U.S. 302 (1989). He also argues that Reece would not consider evidence of substance abuse at all which clashed with her duty to consider *all* of the evidence in deciding the special issues. TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1). Finally, Appellant likens Reece to the hypothetical juror in *Morgan v. Illinois*, 504 U.S. 719, 739 (1992), who had effectively decided the merits of the case before hearing any evidence of mitigating or aggravating circumstances.

A capital jury may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

*Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (emphasis in original) (quoting and adopting rule of plurality in *Lockett v. Ohio*, 438 U.S. 586 (1978)). But a juror "may give any weight or no weight to particular evidence" in assessing the special issues. *Soria*, 933 S.W.2d at 65 (explaining that United States Supreme Court has not yet mandated that jurors must give weight to any particular type of evidence offered in mitigation). The constitution only requires that a juror not be precluded from considering mitigation evidence and that a juror be given a vehicle to give effect to such evidence. *Id.*

Further, we have previously rejected the argument that *Penry* and its progeny mandate that jurors must give mitigating weight to any particular evidence offered at punishment. *Heiselbetz*, 906 S.W.2d at 508. There is no precedent from this Court or from the United States Supreme Court requiring that jurors find certain kinds of evidence to be mitigating. Reece agreed that she would consider all of the evidence when deciding the mitigation issue. While she did not view substance abuse to be mitigating, she was not required to do so. Because Reece agreed that she would consider all of the evidence when deciding the mitigation issue, she was not like the venire person discussed in *Morgan*. *See* 504 U.S. at 738–39 (stating that any juror who says they will automatically vote for death without regard to mitigating evidence is announcing intention to not follow the instructions, and that any juror to

whom mitigating factors are irrelevant should be disqualified for cause because they have formed an opinion without basis in the evidence).

The trial court did not abuse its discretion in overruling Appellant's challenge for cause against Reece.

### e. Venire person R. Rodriguez

Appellant challenges the trial court's denial of his challenge for cause to venire person Rodriguez on the basis that he would not view evidence of substance abuse or an abusive upbringing as mitigating. As stated above, a juror "may give any weight or no weight to particular evidence" in assessing the special issues. *Soria*, 933 S.W.2d at 65. The constitution only requires that a juror not be precluded from considering mitigation evidence and be given a vehicle to give effect to such evidence. *Id.* The trial court did not abuse its discretion by denying Appellant's challenge to Rodriguez on these grounds.

### f. Venire person D. Hinojosa

Appellant claims that venire person Hinojosa was challengeable for cause because she leaned strongly toward a guilty verdict and toward an affirmative answer on the future dangerousness special issue, and because she would never find sufficient mitigation evidence to overcome her inclination toward the death penalty.

Appellant points to an initial exchange between Hinojosa and the prosecutor in which Hinojosa appeared to equivocate on whether she could find Appellant not guilty if the State failed to prove all of the elements:

> Q. If the State were to fail to prove any one of these elements beyond a reasonable doubt, would you be able to return a verdict of "not guilty"?

> A. If anything—If you couldn't prove anything, I think I could, but I can't tell you that 100 percent because I am not in that situation, so it's hard to say. I mean, I think I would be able to, but—Now, if the evidence and the proof was not there, I mean, I think I could, you know, "not guilty."

Further discussion reflects that Hinojosa was confused during that exchange. After the prosecutor clarified that the State must prove every element, Hinojosa stated that she was "clearer now" about the law and that she would hold the State to its burden of proving each element, and would be able to enter a verdict of "not guilty" if the State failed to prove even one of the elements. This exchange does not support a conclusion that Hinojosa was biased in favor of a guilty verdict.

Arguing that Hinojosa leaned in favor of the death penalty, Appellant relies on Hinojosa's statements initially indicating that she believed a death sentence would be an appropriate punishment for, as defense counsel framed it, a "child-killer" who had no legal justifications or defenses. However, those statements were not made in response to questions that were framed within the context of the special issues; rather, defense counsel had asked Hinojosa what she thought would be an

appropriate punishment based on the facts of the case alone without regard to the special issues.[6] When in later questions, defense counsel asked Hinojosa how she would answer the special issues, Hinojosa consistently said that she would not automatically lean toward death, but would consider and base her answers on all of the evidence. In the following exchange, Hinojosa summed up her willingness and ability to keep an open mind and listen to all of the evidence when deciding the special issues:

> Q. Okay. Again, at that point, once you have made that decision about guilt or innocence, once you have made that decision that [he is]guilty, boy, you are already strongly leaning toward the death penalty. Without ever hearing any evidence about future danger, without hearing any of the mitigation evidence, for you, once you made that decision, you are leaning one way?

---

[6] For example, defense counsel asked:

> Q. So, again, there [are] no legal excuses for that capital murder, there [are] no justifications for it, no legal justifications, and the person wasn't insane. So, now that you and those jurors have made that decision just about guilt or innocence with that kind of guilty child-killer, tell me about your beliefs and your values when it comes to the death penalty as the appropriate punishment for that kind of guilty child-killer.

Another example:

> Q. We haven't heard anything about the punishment phase, the future danger [and] mitigation [special issues], but when it comes to making that decision, once you have made that decision for guilt, what I am hearing you say is, "I have decided that they are guilty of killing a child under ten, decided there is no accident, there is no mistake, there is no legal justification, no legal excuse." For you, at that point, the death penalty is really the only appropriate punishment?

A. See, I don't think so. I mean, it's going to depend on the evidence and what is presented before me – . . . – if I was chosen. I don't think it would —I mean, it wouldn't come in just automatically in the first proof of evidence I see. "Okay, that is it." I mean, I really don't think—I have never been in this situation, I really can't tell you 100 percent once things are presented, you know, but knowing me, I would think, you know, I would be open to everything and listening to everything.

Finally, Appellant argues that Hinojosa was challengeable because she would never find sufficient mitigation evidence to overcome a sentence of death. The record does not support this claim. Hinojosa stated at one point that she would "probably not" find enough mitigation evidence to overcome a death sentence after a finding of guilt for the murder of a child and yes on the future dangerousness issue. At other times, in response to the same scenario, she said that she didn't know, that "I can't tell you how I would vote until everything is over" but that "if it goes exactly like you said, . . . then it would strongly go towards the death penalty." Still later, Hinojosa stated that she would need to hear all of the evidence, saying, "I want to hear everything. I want to see the proof and all the evidence and everything before a decision was made." Her last word on the mitigation issue was that "it depends on the evidence and what is proven before I could 100 percent say how I would answer that question." Because Appellant has not shown that Hinojosa was unwilling to consider mitigation evidence, the trial court did not abuse its discretion in denying his challenge for cause.

### g.     Venire person J. Rainey

Relying on *Caldwell v. Mississippi*, 472 U.S. 320, 324–25 (1985), Appellant claims that the trial court should have granted his challenge for cause against venire person Rainey because she erroneously believed that she only had to answer the special issues and then "the law," not the jurors, would dictate the sentence to be imposed. Appellant takes Rainey's responses out of context.

At the beginning of defense counsel's voir dire of Rainey, the following exchange occurred:

> Q. Just for kind of my own education, when you came to the big panel on January the 11th was it your understanding that you just had to answer two questions and then the law would dictate the sentence?
>
> A. Yes. Because I never knew really honestly how it worked until—as we are being educated through this process and being told how that works.

Defense counsel's question to Rainey concerned Rainey's understanding about the sentencing process when she first arrived to the panel, before the law was properly explained. During individual voir dire, the trial court explained to Rainey that "the jury would assess either death or life without parole" based upon its answers to two questions, and that "[i]f you answer these questions in a particular way, it will be death" and "[i]f you answer them another way, it will be life without parole." The court then further explained the special issues. When asked if she understood the process, Rainey indicated that she did. The prosecutor further explained the sentencing structure to Rainey, noting that the jury does not "circle one or the other"

punishment, but rather "make[s] decisions that end up, result in, either the death penalty or life without parole." Rainey responded "Right," and stated that she understood when the prosecutor explained the special issues and the jury's role in greater detail.

Appellant does not point to any other responses from Rainey suggesting that she did not have a proper understanding of the jury's role at punishment. As noted above, defense counsel's question concerned Rainey's understanding of the sentencing process when she first arrived for jury duty. Counsel did not attempt to clarify Rainey's answer or probe her understanding and ability to follow the law once it was explained to her. Before a venire person may be excused for cause, the law must be explained to the venire person and she must be asked whether she can follow that law regardless of her personal views. *Davis*, 329 S.W.3d at 807. Appellant fails to show that Rainey understood the law and could not follow it. The trial court did not abuse its discretion in denying Appellant's challenge to Rainey on these grounds.

### h.    No harm shown

As discussed above, because Appellant received two additional peremptory strikes, he cannot demonstrate harm unless he shows that the trial court erroneously denied at least three of his challenges for cause. *See Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993). Appellant contends that the trial court erred by

denying eleven of his challenges for cause. We have reviewed nine of the challenged rulings and found no harm as to Ellwanger and Webb and no trial court error as to seven of the challenged venire persons. Accordingly, even if we assume that the trial court erred in denying Appellant's challenges for cause to the two remaining venire persons at issue, G. Reed and G. Hodapp, Appellant cannot show harm. *See id.*

We overrule point of error five.

## VI.  INSTRUCTIONS REGARDING PRESIDING JUROR

The jury charge at the guilt phase included the following instruction:

Your first task will be to pick your Presiding Juror. The Presiding Juror should conduct the deliberations in an orderly way. Each juror has one vote, including the Presiding Juror. The Presiding Juror must supervise the voting, vote with other members on the verdict, and sign the verdict sheet.

Appellant objected to the instruction on the ground that it improperly directed the presiding juror to "conduct some sort of supervision over the other jurors." He argued that he had "a right to a fair and impartial trial by jury, not trial by Presiding Juror." The trial court overruled the objection.

In his sixth point of error, Appellant argues that the instruction improperly expanded the foreman's statutory duties and encroached upon Appellant's Sixth Amendment right to an impartial jury. He argues that the instruction potentially placed the foreman in a position to influence or pressure the other jurors, and that

the instructions to "conduct the deliberations" and "supervise the vote" could be interpreted as a license to control and disrupt the impartiality of the proceedings.

Appellant overstates the scope and nature of the instruction. The instruction's only language of supervision relates to voting. The instruction is otherwise administrative in nature, tasking the presiding juror with conducting deliberations in an orderly manner. It is difficult to conceive how a capital jury (or any jury) would efficiently proceed without someone providing some sort of order or structure to the complex process, by calling for and collecting votes. The law recognizes this by specifically requiring that the jury select a foreman. TEX. CODE CRIM. PROC. art. 36.26. Nothing in the trial court's instruction suggested that the foreman's views carried greater weight than those of other jurors or that the foreman occupied a position of influence beyond providing order to the deliberations and supervising voting. Appellant's claim is not supported by the language of the charge or anything in the record. The trial court did not err by overruling Appellant's objection to the instruction. We overrule point of error six.

## VII. RECORDED JAIL CALL

The State sought admission at the guilt phase of several phone calls between Appellant and other persons recorded while Appellant was in jail awaiting trial. In one of the calls, Appellant can be heard saying:

I'm just trying to tell my lawyers to do everything they can for me, like, please, y'all got to try something. I know y'all can pull a rabbit out of the hat, I know y'all can. It's just, it's going to be hard, I know, but I know y'all can do it, I know y'all can. They're trying their hardest right now, they're trying. So, I mean, all I can do is just wait and hope for the best.

The State offered that recording as clip two of Exhibit 30. In a hearing outside the jury's presence, Appellant made the following objections and statements concerning the clip:

The first minute and one second is—is 401 relevance objection. [sic] It doesn't make any fact of consequence more or less—more or less probable in this particular case. And to allow that evidence in would be to deny [Appellant] due process and a fair trial under both the U.S. and Texas Constitutions.

The last minute and fifteen seconds, again, is the same. The last minute and fifteen seconds is a discussion of—our—our objection would be identical, I guess. It's a discussion of what—what [Appellant] would— what he—what he expects from his lawyers. It doesn't contain any discussions regarding conversations he's had with us, it's just his expectations.

The trial court overruled Appellant's objections.[7] Later, immediately before the recordings were admitted and published to the jury, the court held a hearing outside the jury's presence to revisit the recordings, some of which had been edited and redacted, and to allow Appellant to renew his objections. As to clip two, Appellant stated that his objection to the clip "is to relevance . . . and some

---

[7] The State agreed that the first part of the clip was irrelevant and omitted that portion. The above quoted clip reflects the edited version.

constitutional objections to that as well." The court again overruled the objections. The clip was published to the jury and admitted into evidence in the above form.

In point of error seven, Appellant claims that the trial court abused its discretion by admitting evidence concerning conversations between Appellant and counsel in violation of due process. In support of this claim, Appellant argues that admission of the recorded call "concerning the defendant's communications with counsel" undermined his "fundamental" right to counsel. He also says that, "as a lay person," his opinions concerning his own case "could hardly be relied on as having any of the evidentiary reliability that due process requires." Finally, Appellant argues that the recorded phone call conveyed the message that Appellant had retained counsel and had communicated with counsel about his expectations for the case, in violation of Article 38.38 of the Code of Criminal Procedure. TEX. CODE CRIM. PROC. art. 38.38 (providing that "[e]vidence that a person has contacted or retained an attorney is not admissible on the issue of whether the person committed a criminal offense.").

An objecting party must convey to the trial judge the particular complaint, including the precise and proper application of the law and the underlying rationale. *Pena v. State*, 285 S.W.3d 459, 463–64 (Tex. Crim. App. 2009). To avoid forfeiting a complaint, the objecting party must "'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand

him at a time when the judge is in the proper position to do something about it.'" *Id.* (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). And, the complaint on appeal must comport with the complaint made at trial. *Id.* A general or imprecise objection can be sufficient to preserve error, "but only if the legal basis for the objection is obvious to the court and to opposing counsel." *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).

Appellant's objections to the clip were not sufficiently specific or otherwise apparent from the context to support the various claims and arguments he makes on appeal. Moreover, his trial objections do not comport with his arguments on appeal.

Apart from his relevance objection (which he does not bring forward on appeal), Appellant's objections did not provide the trial court with sufficient information to understand the crux of his argument. Appellant stated that admission of the clip would deny him "due process and a fair trial" under both constitutions. He did not elaborate or provide any argument. His comments following that objection were explanatory in nature, stating his view that the clip reflected Appellant's expectations and did not "contain any discussions regarding conversations he's had with [his lawyers], it's just his expectations." Moreover, counsel's comments at trial that the call did not contain any discussions regarding conversations between Appellant and his attorneys is contrary to what he now argues, that the call concerned "the defendant's communications with counsel."

Appellant argues that admission of the clip violated (1) his "fundamental" right to counsel which was undermined when the State "was permitted to use information concerning the defendant's communications with counsel regarding his assessment of the case against him in order to imply that counsel faced an impossible task[,]" (2) due process because Appellant's lay opinion about his own case lacked "evidentiary reliability[,]" and (3) Article 38.38. Appellant's trial objections do not align with these arguments and claims. Appellant did not mention his "right to counsel" at trial. He invoked "due process and a fair trial" but he did not articulate a theory in support of those claims. Appellant did not mention Article 38.38 at all.

Appellant concedes that he did not invoke Article 38.38 by name, but he argues that such claim was apparent from the context and also that the protections afforded by Article 38.38 should be deemed a "waivable-only" right. *See Marin v. State*, 851 S.W.2d 275, 280 (Tex. Crim. App. 1993). Article 38.38 provides in part that evidence that a person contacted or retained counsel is not admissible on the issue of that person's guilt. TEX. CODE CRIM. PROC. art. 38.38. Nothing in the language of the provision suggests that it is a waivable-only right. Appellant has failed to preserve his complaint about the admission of clip two. We overrule point of error seven.

## VIII.  JUROR RESPONSIBILITY UNDER ARTICLE 37.071

In his eighth point of error, Appellant challenges the constitutionality of Article 37.071. Specifically, he argues that the special issues impermissibly distance the jurors from the effect of their answers by reducing their task to simply answering "two indirect questions" rather than asking them to directly assess the punishment of a life sentence or the death penalty, citing *Caldwell v. Mississippi.* 472 U.S. 320 (1985).

The special issues statutory scheme in Article 37.071 is explicit about the effect of the jury's answers. Article 37.071 requires in part that the court instruct the jury that in deliberating on the future dangerousness special issue, it "shall consider all evidence admitted at the guilt or innocence stage and the punishment stage . . . *that militates for or mitigates against the imposition of the death penalty*." TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(1) (emphasis added). The mitigation special issue, as fashioned by Article 37.071, instructs the jury to decide, "[w]hether, taking into consideration all of the evidence . . . there is a sufficient mitigating circumstance or circumstances *to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed*." *Id.* at § 2(e)(1) (emphasis added). Finally, Article 37.071 requires that the jury be informed of the effect of their answers to the special issues. The court shall instruct the jury that if it "answers that a circumstance or circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the court will sentence the

defendant to imprisonment in the Texas Department of Criminal Justice for life without parole." *Id.* at § 2(e)(2)(A).

Appellant concedes that this Court has rejected this argument in other cases, citing *Rodriguez v. State*, No. AP-75,901, slip op. at 61(Tex. Crim. App. March 16, 2011) (not designated for publication), but asks the Court to revisit the issue. We decline to do so. We overrule point of error eight.

## IX.   CLOSING ARGUMENT

In point of error nine, Appellant claims that the trial court erred in permitting the State's closing argument at punishment which urged the jury to send a message to the community. Appellant contends the argument violated the Eighth Amendment's individualized-sentencing requirement.

The prosecutor argued at punishment:

> When you answer the questions and you make your decisions, it must be evidence-based, of course. And with your decisions, you set the community standard. With your decisions, you send a message. You send a message to our community.

The trial court overruled Appellant's objection that the argument violated his right to individualized sentencing under the Eighth Amendment. The prosecutor continued:

> The community doesn't tell you what to do. Do not feel pressure from anyone else. Your decision must be based on the evidence. Don't feel —you tell them what the answer is, not the other way around. You don't—you're not pressured to do anything. Your decision is based on

the evidence and what you find and will be respected by all. You make the decision. You set that standard. It is based on your decision, your evaluation of the evidence. Absolutely it is.

With your decision, you say what the appropriate sentence is. You tell the community what the appropriate—you're telling them what the appropriate sentence is. You're telling other—others who are vulnerable to this sort of abuse what will happen.

Appellant again objected that the argument violated his right to individualized sentencing. The State is generally not permitted to argue that the community demands or expects a certain punishment. *Freeman v. State*, 340 S.W.3d 717, 729 (Tex. Crim. App. 2011); *Borjan v. State*, 787 S.W.2d 53, 55-56 (Tex. Crim. App. 1990). The State may address community concerns, however, and make a general argument that juries should deter crime by their verdicts. *Freeman*, 787 S.W.3d at 729. Such arguments are an acceptable plea for law enforcement. The State is also permitted to argue the impact of the verdict on a particular portion or subset of the community. *Borjan*, 787 S.W.2d at 56.

Appellant acknowledges that the Court has previously held that the State's argument that the jury should send a message to the community is a permissible appeal for law enforcement. *See Ex parte Scott*, 541 S.W.3d 104, 122 (Tex. Crim. App. 2017) (holding that it was proper plea for law enforcement for State to ask the jury to send a message to community that child predatory behavior will not be tolerated). Nonetheless, he maintains that the State's argument asked the jury to

decide the case based on the message that would be conveyed to the community, rather than on the facts and the evidence, in violation of the Eighth Amendment's requirement for individualized sentencing in capital cases.

Here, the prosecutor did not ask the jury to send a particular message to the community with its verdict. Rather, the prosecutor repeatedly reminded the jury to base its decision on the evidence. The prosecutor emphasized that the jury should "not feel pressure" from the community to render a certain verdict, but also noted that whatever it decided *would* send a message about the appropriate sentence to the community and "to others who are vulnerable to this sort of abuse." Because the prosecutor's argument was within the bounds of permissible argument, the trial court did not abuse its discretion in overruling Appellant's objections. We overrule point of error nine.

## X. THE 10-12 RULE

In his tenth point of error, Appellant argues that Article 37.071, Section 2 is unconstitutional because it prohibits informing jurors of the effect of a single juror's "no" vote on the future dangerousness special issue. We have considered and rejected this argument many times. *See, e.g.*, *Coble v. State*, 330 S.W.3d 253, 297 (Tex. Crim. App. 2010); *Sorto v. State,* 173 S.W.3d 469, 492 (Tex. Crim. App. 2005). We overrule point of error ten.

## XI. DEFINITION OF MITIGATING EVIDENCE

In point of error eleven, Appellant claims that the trial court erred by failing to declare Article 37.071, Section 2(f)(4) unconstitutional for limiting the definition of mitigating evidence to that which reduces the defendant's moral blameworthiness. Appellant concedes that this Court has previously rejected similar arguments. *See Coble*, 330 S.W.3d at 296. He urges the Court to revisit the issue. We decline to do so.

Appellant also argues that the statutory definition of mitigating evidence suggests that the jury must find a nexus between reduced moral blameworthiness and the capital offense committed, citing *Tennard v. Dretke*, 542 U.S. 274 (2004). We have rejected this argument, stating that there is no "nexus" requirement in the current statutory definition. *See Coble*, 330 S.W.3d at 296. We decline to revisit this issue and overrule point of error eleven.

## XII. CRITICAL TERMS

In his twelfth point of error, Appellant faults the trial court for its failure to define the following terms and phrases within Article 37.071, Section 2: "personal moral culpability," "moral blameworthiness of the defendant," "probability," "criminal acts of violence," "continuing threat to society," and "society." He argues that this Court should provide definitions for the terms. We have repeatedly addressed and rejected such claims. *See Camacho v. State*, 864 S.W.2d 524, 536 (Tex. Crim. App. 1993) (explaining that this Court's reluctance to define terms

within 37.071 is founded on respect for division of authority between legislature and judiciary and noting that legislature has directed that words not specifically defined shall be understood in their ordinary sense); *see also Jenkins v. State*, 493 S.W.3d 583, 613–18 (Tex. Crim. App. 2016) (rejecting claims that trial court erred in failing to define "probability," "criminal acts of violence," "militates," and "continuing threat to society"); *Davis*, 313 S.W.3d at 354–55 (rejecting claims that trial court erred in failing to define "personal moral culpability," and "moral blameworthiness," among other terms); *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (rejecting claims that trial court erred by failing to define "probability," "criminal acts of violence," "continuing threat to society" and "society"). We overrule point of error twelve.

## XIII. CONCLUSION

We affirm the trial court's judgment of conviction and sentence of death.

Delivered: March 1, 2023

Do Not Publish